RECEIPT # 67063
AMOUNT $ 250
SUMMONS ISSUED Y-8
LOCAL RULE 4.1_____
WAIVER FORM _____
MCF ISSUED_____
BY DPTY. CLK. PM
DATE 9-22-05

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| M. LEE HARRIS 1991 TRUST, by LEE HARRIS, TRUSTEE, Derivatively on Behalf of Nominal Defendant INVESTORS FINANCIAL SERVICES, CORP.<br><br>Plaintiff,<br><br>v.<br><br>KEVIN J. SHEEHAN, MICHAEL F. ROGERS, JOHN N. SPINNEY JR., ROBERT D. MANCUSO, EDMUND J. MARONEY, PHYLLIS S. SWERSKY, THOMAS P. MCDERMOTT, and FRANK B. CONDON, JR.<br><br>Defendants,<br><br>And<br><br>INVESTORS FINANCIAL SERVICES, CORP.,<br><br>Nominal Defendant. | CIVIL ACTION NO.<br><br>**05cv11922 RCL**<br><br>MAGISTRATE JUDGE _____ |

### VERIFIED SHAREHOLDER DERIVATIVE
### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, the M. Lee Harris 1991 Trust, by Lee Harris, Trustee, by and through its attorneys submits this Complaint against the Defendants named herein.

### NATURE OF THE ACTION

1.   This is a shareholders derivative action brought for the benefit of Nominal Defendant, Investors Financial Services, Corp. ("Investors Financial" or the "Company"), against Defendants Kevin J. Sheehan ("Sheehan"), Michael F. Rogers ("Rogers"), John M. Spinney, Jr. ("Spinney"), Robert D. Mancuso ("Mancuso"), Edmund J. Maroney ("Maroney"), Phyllis S. Swersky ("Swersky"), Thomas P. McDermott ("McDermott") and Frank B. Condon, Jr. ("Condon").

2. Investors Financial operates as a bank holding company for Investors Bank & Trust Company that provides asset administration services for the financial services industry in the United States.

3. The Complaint alleges that Defendants' representations during the Relevant Period (October 15, 2003 through July 14, 2005) regarding Investors Financial were materially false and misleading when made for the following reasons: (1) the Company's improper accounting practices resulted in a $6.2 million reduction in net interest income; (2) the Company lacked adequate internal controls; (3) the Company's financial results were in violation of Generally Accepted Accounting Principles ("GAAP"); (4) due to the impact of interest rate yield compression and the flattening of the interest rate curve the Company's 2005 guidance was not achievable; (5) Defendants' use of interest rate swaps to hedge against the negative impact to the balance sheet was ineffective; and (6) as a consequence of the foregoing, Defendants' statements with respect to the Company's growth and progress lacked in all reasonable basis when made.

4. On July 14, 2005, the Company announced that its previously announced earnings guidance for 2005 and 2006 was not achievable. On this news, shares of Investors Financial fell $7.47 per share, or 17.99%, on July 15, 2005, to close at $34.05 per share

5. At the same time as the Defendants were making materially false or misleading statements about the Company's financial condition and business prospects, the Individual Defendants sold the Company's shares from their personal holdings reaping tens of millions of dollars in illegal insider trading proceeds. In addition, as a result of the Defendants' wrongful conduct, the Company has been named in numerous securities class action lawsuits and exposed to millions of dollars in potential liability, legal fees and other expenses.

2

## JURISDICTION AND VENUE

6.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000 exclusive of interest and costs.

7.  This action is not a collusive one designed to confer jurisdiction on a Court of the United States which it would otherwise not have.

8.  Venue is proper in this district, because a substantial portion of the transactions and wrongs complained of herein occurred in this district. Defendants either reside in or maintain executive offices or participated in board meetings in this district, and have received substantial compensation in this district by engaging in numerous activities and conducting business here.

## PARTIES

9.  Plaintiff, the M. Lee Harris 1991 Trust, is and was a shareholder of Nominal Defendant, Investors Financial during the time period in which the wrongful conduct alleged herein occurred through the present. The M. Lee Harris 1991 Trust brings this action through its Trustee, Lee Harris. Lee Harris is a citizen and resident of Oklahoma.

10.  Nominal Defendant Investors Financial is a Delaware corporation with its principal executive offices located at 200 Clarendon Street, P.O. Box 9130, Boston, MA, 02117.

11.  Defendant Sheehan has served as the Company's Chief Executive Officer and Chairman of the Board of Directors since June 1995. Sheehan has served as a director of the Company since 1990. Sheehan is a citizen and resident of Massachusetts.

12.  Defendant Rogers has served as the President of the Company since August 2001 and has had responsibility for all operating areas since 1990. Rogers served as an Executive Vice

3

President of the Company from September 1993 to August 2001. Rogers is a citizen and resident of Massachusetts.

13. Defendant Spinney has been a Senior Vice President of the Company since August 2001 and Chief Financial Officer since January 2002. Spinney is a citizen and resident of Massachusetts.

14. Defendant Mancuso has been the Company's Senior Vice President - - Marketing and Client Management since September 1993. Mancuso is a citizen and resident of Massachusetts.

15. Defendant Maroney was at all times during the Relevant Period the Company's Senior Vice President - - Technology. Maroney is a citizen and resident of Massachusetts.

16. Defendant Swersky has been a director of the Company since February 1996 and serves on the Company's Audit Committee. Swersky is believed to be a citizen and resident of Massachusetts.

17. Defendant McDermott has been a director of the Company since 1995 and serves on the Company's Audit Committee. McDermott is believed to be a citizen and resident of Massachusetts.

18. Defendant Condon has been a director of the Company since 1986. Condon is believed to be a citizen and resident of Massachusetts.

19. The Company's Board of Directors consists of seven (7) members - - Defendants Sheehan, Swersky, McDermott and Condon and non-parties, James M. Oates ("Oates"), Robert B. Fraser ("Fraser") and Edward F. Hines, Jr. ("Hines").

## DUTIES OF THE INDIVIDUAL DEFENDANTS

20. By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the

4

Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care. Each director and officer of the Company owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company. In addition, the Defendant Directors owed a duty to the Company and its shareholders to implement adequate internal controls and procedures to reasonably assure that the financial condition and business prospects of the Company were reported truthfully and accurately, that the Company complied with all applicable state and federal laws and that the Company's financial statements were prepared and presented in accordance with generally accepted accounting principles ("GAAP"). As set forth below the Defendant Directors violated these duties and abdicated their oversight responsibilities to the Company. As a result, the Company has been named as a defendant in, and exposed to millions of dollars of liability from, securities class action lawsuits and has incurred and will continue to incur legal, accounting and other expenses. In addition, Defendants Spinney, Rogers, Mancuso, Maroney and Director Defendants Sheehan, McDermott, Condon and Swersky have reaped millions of dollars in illicit insider trading profits.

21.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

22.     As further alleged herein, Investors Financial's current Board of Directors is unable to make an impartial determination as to whether to institute legal proceedings to redress the wrongful conduct alleged herein because there is a substantial likelihood that a majority of its members would be found liable for non-exculpated breaches of their fiduciary duties to the Company and shareholders by their participation or acquiescence in the wrongdoing alleged

herein and/or complete failure to perform their oversight duties to the Company, failure to oversee the Company's compliance with legally mandated disclosure standards and systemic failure to assure that a reasonable information and reporting system existed.

## BACKGROUND

23. Investors Financial operates as a bank holding company for Investors Bank & Trust Company that provides asset administration services for the financial services industry in the United States. The Company offers core and value-added services to financial asset managers, such as mutual fund complexes, investment advisors, family offices, banks and insurance companies. Its core services include middle office outsourcing, global custody, multicurrency accounting, and fund administration. The value-added services consist of securities lending, foreign exchange, cash management, performance measurement, institutional transfer agency, investment advisory services, lines of credit and brokerage, and transition management services.

## SUBSTANTIVE ALLEGATIONS

24. On October 15, 2003, Investors Financial issued a press release entitled "Investors Financial Services Corp. Announces Third Quarter Earnings up 54%." Therein, the Company, in relevant part, stated:

> Investors Financial Services Corp. (Nasdaq: IFIN) reported third quarter diluted earnings per share of $0.40, an increase of 54% from $0.26 in the third quarter of 2002. Net income for the third quarter was $26.4 million, up 53% from $17.3 million in the third quarter of 2002. For the nine months ended September 30, 2003, the Company reported diluted operating earnings per share of $1.01, an increase of 33% from $0.76 for the same period in 2002. Net operating income for the nine months ended September 30, 2003 was $67.0 million, an increase of 32% from $50.6 million for the same period of 2002. Prior year diluted earnings per share reflect the two-for-one stock split which occurred on June 14, 2002.
>
> \*\*\*
>
> Kevin J. Sheehan, Chairman and Chief Executive Officer,

6

commented, "Investors Financial Services delivered extremely impressive results for the third quarter of 2003. Driven by new business wins, higher equity values, and prudent expense management, the Company continues to display strong earnings growth. In addition, we expect to complete most of the conversion of the $22 billion of Barclays Global Investors Canada Limited assets to our systems by the end of 2003."

25.  That same day, October 15, 2003, Investors Financial's management held an investor conference call to discuss its third quarter earnings. During the call, Defendant Spinney made the following statements:

> We generate asset servicing fees based on assets under administration, the number of transactions generated by our clients, and managed risk (ph) income. These three revenue components **create a natural hedge for our business model, which has been one of the factors enabling us to succeed in a variety of market environments.**
>
> **The breakdown of our revenue stream for the third quarter of 2003 was 55 percent asset based, 15 percent transaction based, and 30 percent net interest income based, continuing the shift that we have witnessed recently to more of a contribution from asset-based fess as opposed to net interest income.**
>
> \* \* \*
>
> **Securities lending decreased 12 percent year-over-year, due to a smaller lending book, and declined linked quarter primarily due to the end of the international dividend season. Net interest income was flat on a year-over-year basis and decreased 8 percent linked quarter, primarily due to increased prepayments in our mortgage-backed securities portfolio through most of the summer. We expect lower prepayment activity in the fourth quarter.**
>
> **Also we recorded an additional interest expense in the third quarter of approximately 1 million related to the ineffectiveness of our swap portfolio in accordance with FAS 133. The 1 million will flow back into net interest income over the remaining life of the swaps. Absent a further cut in the Fed funds rate, we expect little to no impact going forward.**
>
> **We continue to maintain strong net interest margin spread as a result of continued healthy levels of client funding. The linked-**

7

> **quarter net interest margin decreased by 27 basis points to 1.81 percent, while the linked-quarter interest rate spread contracted by 26 basis points to 1.71 percent.** Compared to the same quarter of last year, net interest income was flat, primarily as a result of a larger balance sheet offsetting a lower interest rate environment.
>
> \* \* \*
>
> **We continue to be cautiously optimistic about the capital markets and interest rate environment. As such we are increasing our GAAP EPS guidance to a range of $1.30 to $1.32 a share for the year ended December 31, 2003; and we're revising our diluted operating earnings-per-share target to a range of $1.41 to $1.43. We remain comfortable with our long-term growth rate of 25 percent in EPS. I would now like to open up the call to your questions.**

(Emphasis Added.)

26. Additionally, during the call Defendant Spinney had the following discussions with several industry analysts:

> JON ARFSTROM, ANALYST, RBC CAPITAL MARKETS: And then in terms of your guidance, any change in the typical assumptions that you give for a flattish market?
>
> JOHN SPINNEY: In terms of rate environment?
>
> JON ARFSTROM: Rate environment and equity market levels.
>
> JOHN SPINNEY: We have no equity market upside built into our estimates. We never do that. In terms of interest rate environment, in terms of the rest of the year, obviously we don't think debt funds is going anywhere from where it is today. And the ten-year will probably trade somewhere, we hope, within the 4 percent range.
>
> JON ARFSTROM: Okay. **And you're still comfortable with the 25 percent growth rate on that $1.40 to $1.43?**
>
> JOHN SPINNEY: **Currently we are. Yes, Jon.**
>
> \*\*\*
>
> CASEY AMBRICH, ANALYST, MILLENNIUM PARTNERS: One concern that some investors have had is regarding the potential NBS mark that the company might incur with the ten-year moving up

8

here; the yields anyway. **I was wondering if you could talk a little bit about your swaps on the liability side of the balance sheet? And how that works to hedge that?**

JOHN SPINNEY: Certainly from the ten-year perspective on the asset side of the balance sheet, the mark on that is positive still. It has never run into a negative mark to market. And we're very comfortable with that, and it doesn't have an impact on our regulatory capital if it did.

Secondly on the swap portfolio, we use swaps basically against some of our deposit liability products to extend the maturities and fix those against fixed-rate assets. That really helps us to keep the duration up on the liabilities and matched with the asset duration.

\*\*\*

MERYL WITMER, ANALYST, EAGLE CAPITAL PARTNERS: **This is actually Meryl Witmer. Excuse me for being a little dense, but I am just looking at the comp and benefit line, which I believe went from almost 51 million in the second quarter to 42.5 million this quarter.** Is that like a lower bonus accrual? If you didn't let anybody go, is that a lower bonus accrual? Did people leave? Did you have some consultants you are now paying? What caused that?

JOHN SPINNEY: Some of that is bonus accrual; and some of that is taking the efficiencies in terms of headcount reductions in the business.

MERYL WITMER: So there were headcount reductions?

JOHN SPINNEY: As a result of not replacing positions for people that left the firm, where we had efficiencies in the technology that allowed us not to replace positions.

MERYL WITMER: I see; so you let some people run off and the technology took its place.

JOHN SPINNEY: Exactly. It just goes hand-in-hand with depreciation expense being up because we put the technology in place.

MERYL WITMER: I see. That ties in nicely. Now the lower bonus accruals, is that a foreshadowing of things not great to come?

JOHN SPINNEY: I think part of that, and we talked about it on the second-quarter call, was just a tremendous second quarter for us. **Having the ability to accrue bonuses against hiring earnings in the second quarter; that allowed us to take lower bonus accruals going forward.** And I think giving the REIT charge we took, we're not going to reach the potential of maximizing bonuses. So our accruals are going to be lower just as a result of that.

MERYL WITMER: **So did you front-end load the bonuses into the second quarter?**

JOHN SPINNEY: We **accrue bonuses when we have the room (ph) in the EPS that marries up to it. So if the performance is there, we will accrue bonuses up against the performance.**

MERYL WITMER: **Although this quarter is very good also.**

JOHN SPINNEY: It is. But as we went into the third quarter, we looked at last year and said, last year's third quarter was not the best quarter in terms of transactional revenue; and the markets really took a sharp downturn; **so we were not about to get behind the eight-ball on bonus accruals, and have to make up for it in the summertime.**

* * *

CASEY AMBRICH: One last quick question. Can you give some color on how the margin changed by month? I will start with that.

JOHN SPINNEY: **The net interest margin? By month I don't think it's really that important to go through in detail. But if you look at the decline sequentially, the biggest contributor to that was obviously the prepayments on the mortgage-backed portfolio, that caused earnings to go down on the net interest income line.**

I actually added back the effect of that prepayment; and it probably gets us back to somewhere like 195, 196 from a margin perspective. So I clearly isolated the prepayments on the mortgage-backed portfolio. But we have those slow down now, and we are anticipating to have a fourth quarter of very slow prepayments relative to the third quarter.

(Emphasis Added.)

27. On January 22, 2004, Investors Financial issued a press release entitled "Investors

10

Financial Services Corp. Announces Fourth Quarter Earnings Up 71% and Over $1 Trillion In Assets Processed." Therein, the Company, in relevant part, stated:

> Investors Financial Services Corp. (Nasdaq: IFIN) reported fourth quarter diluted earnings per share of $0.48, an increase of 71% from $0.28 in the fourth quarter of 2002. Net income for the fourth quarter was $31.9 million, up 74% from $18.3 million in the fourth quarter of 2002. For the year ended December 31, 2003, the Company reported diluted operating earnings per share of $1.49, an increase of 43% from $1.04 per share in 2002. Net operating income for the year was $99.0 million, up 44% from $68.9 million in 2002. Prior year diluted earnings per share reflect the two-for-one stock split which occurred on June 14, 2002.
>
> Diluted operating earnings per share and net operating income for the year ended December 31, 2003 exclude a $7.2 million charge, net of federal income tax benefit, that resulted from a retroactive change in Massachusetts tax law enacted in the first quarter of 2003 and the Company's subsequent settlement of the resulting tax assessment with the Massachusetts Department of Revenue. The change in tax law disallowed a dividends received deduction taken by Investors Bank & Trust Company on dividends it had received since 1999 from a wholly-owned real estate investment trust. In the second quarter of 2003, the Company settled this disputed tax issue, agreeing to pay 50% of the liability, resulting in the $7.2 million charge, net of federal income tax benefit.
>
> This press release includes both an income statement based on GAAP and a that excludes the $7.2 million charge described above. Management believes that operating earnings per share and net operating income, which exclude the charge, present a more useful depiction of the Company's actual results of operations because they exclude the effect of a one-time change in tax law that is unrelated to the Company's ongoing operations. Including the $7.2 million charge, the Company recorded GAAP net income for the year ended December 31, 2003 of $91.8 million and GAAP diluted earnings per share of $1.38.
>
> Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "2003 represented another outstanding year for Investors Financial Services. We delivered impressive growth in both revenue and net income, driven by new business wins, stronger capital markets and prudent expense management. In addition, our assets under administration exceeded $1 trillion for the first time. The current improving market conditions and the

> leverage inherent in our business model make us confident in our ability to deliver growth in earnings per share of 25% in 2004."

28. On April 22, 2004, Investors Financial issued a press release entitled "Investors Financial Services Corp. Announces First Quarter Operating Earnings up 79 percent." Therein, the Company, in relevant part, stated:

> Investors Financial Services Corp. (Nasdaq: IFIN) reported first quarter diluted earnings per share of $0.52, an increase of 79% from diluted operating earnings per share of $0.29 in the first quarter of 2003. Net income for the first quarter of 2004 was $35.0 million, up 81% from $19.3 million in net operating income in the first quarter of 2003.
>
> Both diluted operating earnings per share and net operating income for the first quarter of 2003 exclude the previously disclosed $13.9 million, or $0.21 per diluted share, one-time tax accrual that the Company recorded in accordance with Accounting Principles Generally Accepted in the United States of America ("GAAP"). The one-time accrual resulted from a retroactive tax law change during the first quarter of 2003 by the Commonwealth of Massachusetts disallowing a dividends received deduction taken by Investors Bank & Trust Company on dividends received since 1999 from a wholly-owned real estate investment trust. In the second quarter of 2003, the Company settled this disputed tax matter pursuant to an agreement to pay 50% of the liability.
>
> This press release includes both an income statement based on GAAP and a pro forma income statement excluding the one-time tax accrual, which management considers a more useful depiction of the Company's results of operations. Including the tax accrual, GAAP net income for the first quarter of 2003 was $5.4 million and GAAP diluted earnings per share were $0.08.
>
> Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "Investors Financial Services again recorded impressive results in the first quarter of 2004. Led by strong increases in our core asset processing revenue, foreign exchange fees, and net interest income, we were able to grow our revenue by over 30% on a year-over-year basis. Due to our increased revenue and continued operating leverage, we are confident in our ability in 2004 to deliver growth in earnings per share in excess of 25% over our 2003 operating earnings per share."

12

29.     On July 14, 2004, Investors Financial issued a press release entitled "Investors Financial Services Corp. Announces Second Quarter Earnings up 63%." Therein, the Company, in relevant part, stated:

> Investors Financial Services Corp. (Nasdaq: WIN) reported second quarter diluted earnings per share of $0.52, an increase of 63% from $0.32 in diluted operating earnings per share in the second quarter of 2003. Net income for the second quarter was $35.4 million, up 66% from $21.3 million in net operating income in the second quarter of 2003. For the six months ended June 30, 2004, the Company reported diluted earnings per share of $1.04, an increase of 70% from $0.61 in diluted operating earnings per share for the same period in 2003. Net income for the six months ended June 30, 2004 was $70.4 million, an increase of 73% from $40.6 million in net operating income for the same period of 2003.
>
> * * *
>
> Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "The second quarter of 2004 represented another period of solid performance by Investors Financial Services. Our core and ancillary service fees continued to display impressive organic growth rates. New clients, further penetration of existing clients, and strong fund flows into our clients' products all contributed to these robust top-line increases. Given these results, we are confident in our ability to grow our diluted earnings per share in excess of 30% in 2004."

30.     That same day, July 14, 2004, Investors Financial's management held an investor conference call to discuss its second quarter earnings. During the call Defendant Spinney had the following discussions with several industry analysts:

> CARLA COOPER, ANALYST, ROBERT W. BAIRD: I had a question, I guess also about your guidance. Just if I think about your new guidance, even the top end of the range implies that the quarters coming up in the back half of the year are going to be a little weaker than certainly what we saw this quarter. And I'm just wondering sort of philosophically, what sort of lens -- is there anything sort of conservatism baked in there, or what kind of -- I don't think you've ever had a year where the quarters have sort of been flat.
>
> JOHN SPINNEY: **I think on the guidance front, Carla, we**

13

**brought it up to a point where we felt comfortable achieving those numbers. And giving ourselves some flexibility, as we've historically always done, we start with a 25 percent growth rate at the beginning of the year and try to outperform it quarter after quarter and try to guide you up, and try not to get ahead of ourselves.**

***

JAMIE LESTER, ANALYST, SAB CAPITAL MANAGEMENT: Great quarter. First question was on the occupancy expense. What caused the drop quarter-over-quarter in that?

JOHN SPINNEY: Pretty simple; we had favorable valuations on the buildings in Boston and got real estate tax relief, and a final true-up of our operating escalations from the landlords (multiple speakers)

JAMIE LESTER: That's the go-forward run rate on that?

JOHN SPINNEY: It's probably a little higher than that, because there was some pickup related to the whole year. So it's a little bit higher than what it is today.

JAMIE LESTER: Fair enough. And then on the leverage side, the equity was down quarter-over-quarter, I assume because we're marked to market on some of the assets.

JOHN SPINNEY: The marked to market is 25 million negative at the end of the quarter, which is really minor in our opinion and doesn't affect our regulatory capital.

JAMIE LESTER: I'm with you; I'm just trying to see -- you guys, obviously, had net income of what, 35 million? But equity was down 10 million in the quarter. So, I guess, what happened there?

JOHN SPINNEY: We had net income and then we had the marked to market on the portfolio, and the offset for the marked to market in the swaps runs through other OCI.

JAMIE LESTER: So there's another 20 million of swap?

JOHN SPINNEY: Roughly about 20 million; yes.

JAMIE LESTER: And then, where do you see, or how do you stand on the leverage side now? It looks like ending assets (indiscernible) interest-bearing assets of (indiscernible) I guess you look at total

assets. I guess just walk us through where you are on the leverage side; it seems like you're kind of getting -- creeping towards the top-end.

JOHN SPINNEY: We're at like the 5 58 (ph), I think, at the end of the quarter. And I think we will trend a little bit higher towards the end of the year; so that's still under 6 percent.

JAMIE LESTER: It looks like, if you look at a spread, non-interest income to non-interest expense, it seems to be kind of trending up. Should we look at that growth rate -- whatever it is, 5 million a quarter, plus or minus -- as continuing through the year? How do you think about that, or is that even a useful metric to look at?

JOHN SPINNEY: I don't necessarily use that metric per se, but I think you could probably intuitively say that would go up.

JAMIE LESTER: What was the -- you mentioned the adjusted spread. If you take out the prepay penalties on the liability side for the quarter, what were the --?

JOHN SPINNEY: The margin would have been 203 and the spread would have been 196.

JAMIE LESTER: What would the spread have been for the first quarter on that same basis?

JOHN SPINNEY: I don't have that handy; it's probably about 10 basis points higher (multiple speakers) 13 and 206, probably.

JAMIE LESTER: **So you did see some compression in the quarter?**

JOHN SPINNEY: **Slightly.**

(Emphasis Added.)

31. On October 21, 2004, Investors Financial issued a press release entitled "Investors Financial Services Corp. Expects to Report Fully Diluted EPS of $0.51 to $0.53 for Q3 2004; Evaluating FAS 91 Change But Expects No Significant Impact for 2004, 2003 or 2002 Reported Results. The Company Reaffirms Expected Fully Diluted EPS of $2.00 to $2.05 for 2004." Therein, the Company, in relevant part, stated:

15

> **Investors Financial Services Corp. (Nasdaq: IFIN) announced today that it expects to report fully diluted earnings per share of $0.51 to $0.53 for the quarter ended September 30, 2004. The Company also expects to report fully diluted earnings per share of $1.55 to $1.57 for the nine months ended September 30, 2004. The Company is releasing a preliminary earnings estimate today as it finalizes the impact of an expected change in application of Financial Accounting Standard No. 91 ("FAS 91"). This change is not expected to have a material impact on earnings for 2004.**
>
> \* \* \*
>
> Kevin J. Sheehan, Chairman and Chief Executive Officer, stated, "Our business trends remain strong, as both core services and ancillary services continued to show impressive growth in the third quarter. We are pleased with the continued validation of our unwavering commitment to superior client service. We continue to expect to achieve fully diluted earnings per share of $2.00 to $2.05 for 2004."
>
> **Commenting on the change in the application of FAS 91, the Company noted that it has historically applied a prospective method under FAS 91 to determine the amortization of premiums and accretion of discounts on applicable investment securities. The Company has determined that it is appropriate to change to applying a retrospective method on applicable investment securities. The Company does not believe that the impact of this change will be significant in the years 2004, 2003 and 2002. The impact on 2001 reported earnings per share could be higher due to changes in interest rates that occurred in that year. The Company is working closely with its audit committee in evaluating the effects of this change in application of FAS 91, and expects to complete this evaluation by November 15, 2004.**

(Emphasis Added.)

    32.    That same day, October 21, 2004, Investors Financial's management held an investor conference call to discuss its financial announcement. During the call defendants had the following discussions with several industry analysts:

> JON ARFSTROM, ANALYST, RBC CAPITAL MARKETS: **Interesting release. Question on the accounting change, of course. Is it something that the auditors decided needed to be**

16

changed? When did it arise and can you just talk about what needs to be done before you can officially put out the number with the full release?

KEVIN SHEEHAN: Sure. I think clearly everybody is looking at income recognition in this particular area. And we really have re-evaluated our approach. It is an extremely complex and technical area and we wanted to really essentially take a real hard look at what we were doing and make sure that we were using the right methodology. We have gone through an analysis of our portfolio and looked at it under both methodologies. It is a very time consuming and detailed exercise. We have involved both the audit committee and the external auditors in reviewing the results. And I think it will take us probably until the November 15th time frame to complete that exercise and process all the changes to the financials if they are necessary.

JON ARFSTROM: Is it as simple as -- is it conservatism? And if one results in a lower number that's what you will choose or how do you differentiate between which method is the best to use?

KEVIN SHEEHAN: I think they are just really 2 fundamentally different methodologies and I think we have come to the conclusion in conjunction with our advisors that the retrospective method is the more correct method and more consistent with the requirements of GAAP. And we just have to change to it.

JON ARFSTROM: **Okay. Another question, and I'm assuming that it is a net interest income impact which is why the number isn't disclosed in the release?**

KEVIN SHEEHAN: Yes.

\* \* \*

KYLE SIMONAIRRO, ANALYST, T ROWE PRICE: **Do you have an estimate of a range of your net interest margin during the quarter?**

JOHN SPINNEY JR.: No.

(Emphasis Added.)

33. On this news, shares of Investors Financial fell $7.20 per share, or 16.48 percent,

17

on October 22, 2004, to close at $36.50 per share.

34. On November 15, 2004, Investors Financial issued a press release entitled "Investors Financial Services Corp. Announces Third Quarter Earnings up 29%; Wins $160 Billion Middle Office Outsourcing Mandate With New European Client; Completes Previously Disclosed Review of FAS 91 and Related Restatement; Files Amended Forms 10K and 10Q." Therein, the Company, in relevant part, stated:

> Investors Financial Services Corp. (Nasdaq: IFIN) reported third quarter diluted earnings per share of $0.53, an increase of 29% from $0.41 in diluted earnings per share in the third quarter of 2003. Net income for the third quarter was $36.1 million, up 31% from $27.5 million in net income in the third quarter of 2003. For the nine months ended September 30, 2004, the Company reported diluted earnings per share of $1.57, an increase of 71% from $0.92 in diluted earnings per share for the same period in 2003. Net income for the nine months ended September 30, 2004 was $106.7 million, an increase of 74% from $61.2 million in net income for the same period of 2003.
>
> ***
>
> The Company also reported today that it filed its Quarterly Report on Form 10-Q for the quarter ended September 30, 2004. Today the Company also filed an amended Annual Report on Form 10-K/A for the year ended December 31, 2003, and amended Quarterly Reports on Form 10-Q/A for the quarters ended March 31 and June 30, 2004. These filings complete the Company's restatement of its financial statements for the years ended December 31, 2001, 2002, 2003 and for the six months ended June 30, 2004. As previously disclosed, the Company's restatement arose from its application of Statement of Financial Accounting Standards No. 91 to the Company's securities portfolio.
>
> **The Company's cumulative restatement since inception resulting from the accounting review was a reduction of $6.2 million in net interest income. The opening adjustment to retained earnings on January 1, 2001 was an increase of $0.9 million. For the year ended December 31, 2001, the total net interest income adjustment was a reduction of $8.5 million, resulting in a decrease in diluted earnings per share of $0.08. The respective net interest income adjustments for the years ended December 31, 2002, 2003 and 2004 were a reduction of**

> **$2.3 million, an increase of $1.0 million and an increase of $2.7 million. The adjustments to diluted earnings per share in 2002, 2003 and 2004 were a reduction of $0.02 per share, an increase of $0.01 per share and an increase of $0.02 per share, respectively.**
>
> Kevin J. Sheehan, Chairman and Chief Executive Officer, commented, "We have successfully completed a comprehensive review of the accounting for premiums and discounts on each investment in our securities portfolio. Consistent with our preliminary disclosure, our accounting review resulted in no significant change to our 2004, 2003 or 2002 results. Our operating results continue to display the leverage and resilience of our business model. We remain confident in our ability to grow our diluted earnings per share in excess of 30% in 2004."
>
> "Our new business wins include the recent execution of an agreement to provide middle office outsourcing services for approximately $60 billion in assets managed by a new European client," Mr. Sheehan continued. "We have also signed a letter of intent to provide middle office outsourcing services for another $100 billion in assets managed by the same client."

(Emphasis Added.)

35.  That same day, November 15, 2004, Investors Financial's management held an investor conference call to discuss its third quarter earnings. During the call Defendants made the following statements:

> KEVIN SHEEHAN, CHAIRMAN, CEO, INVESTORS FINANCIAL SERVICES CORP.: I will begin by reviewing some of the key points from our restatement process which we successfully completed and then turn to our third-quarter results. John Spinney will finish with the detailed discussion of our financial results.
>
> **Senior management, the audit community of the board, our internal auditors and our independent registered public accountants have completed a comprehensive review of the amortization of premiums and accretion of discounts on all of our investment securities. We have examined the accounting for and evaluation of each and every investment security in our portfolio from December 31, 2000 to September 30, 2004. We are now amortizing premiums and accreting discounts in the**

19

**affected securities in accordance with generally accepted accounting principles, including FAS 91. Again, we're making this statement in relation to all the securities and security types in our portfolio.**

Today, we filed an amended annual report on form 10-KA for the year ended December 31, 2003. Amended quarterly reports on form 10-K -- 10-QA for the first two quarters of 2004 and our quarterly report on form 10-Q for the quarter ended September 30, 2004. We initially reported on October 21 that the impact of this change was not significant for the years 2002 through 2004, **but it resulted in a larger reduction in 2001 reported earnings per share due to the rapidly changing interest rate environment during that period. The company's cumulative restatement since inception, resulting from the accounting review was a reduction of 6.2 million in net interest income. The opening adjustment to retained earnings as of January 1, 2001, was an increase of .9 million.**

**2001's total net interest income adjustment was a reduction of 8.5 million, resulting in a decrease in diluted earnings per share of 8 cents. The net interest income adjustment for 2002 was a reduction of 2.3 million or 2 cents per share. For 2003, the adjustment was an increase of $1 million or 1 cent per share. For 2004, the adjustment was an increase of 2.7 million or 2 cents per share. There was no significant change to our capital or leverage ratios for any restated quarter.** A detailed presentation of the changes arising from the restatement can be found in the reports we filed today with the SEC. In addition, this restatement did not impact the accounting for our SBA portfolio.

We did, however, correct a clerical error in the contractual maturity table in the MD&A section of our 2003 10-K. We previously reported federal agency securities having a yield of 3.16% in the over-10-year category and 2.76% in the 5- to 10-year category. These yields should have been 2.71% and 22.8% respectively, consistent with the income we recognize in our financial statements.

To summarize, we undertook a comprehensive effort to audit, recalculate and correct our financial statements and our SEC filings. We accomplished these tasks in a short period of time thanks to the tireless effort of our dedicated employees.

We will now turn to a review of our financial results. For the quarter ended September 30, 2004, we reported fully diluted earnings per share of 53 cents, up 29% from the third quarter of 2003's diluted